PIEDMONT TRIAD AIRPORT AUTHORITY v. KENT W. URBINE, ANTHONY J. LOSITO, TRUSTEE, THE MONEY STORE/NORTH CAROLINA, INC., S.C. JACKSON, TRUSTEE, AND COMMERCIAL CREDIT LOANS, INC.

No. 367PA00

(Filed 9 November 2001)

**1. Eminent Domain— taking by airport authority—standard of review**

The appropriate standard of review for a taking of land under N.C.G.S. § 40A-47 by an airport authority was de novo.

**2. Eminent Domain— public purpose and public use—distinguished**

Although the terms "public purpose" and "public use" have been used almost synonymously, there is a distinction; the term "public purpose" pertains to governmental expenditures of tax monies, while the term "public use" pertains to the exercise of eminent domain.

**3. Eminent Domain— taking by airport authority for Federal Express—public use**

A taking of land by an airport authority for the exclusive use of Federal Express was for a public use under the two prong test of *Maready v. Winston-Salem*, 342 N.C. 708, where the airport authority's master plan called for the acquisition of the property from as early as 1990, with the 1994 master plan stating that the purpose was the future expansion and development of cargo facilities, showing a reasonable connection with the convenience and necessity of the particular municipality; and the activity benefits the public generally rather than special interests in that Federal Express will be a tenant rather than an owner of the property and the condemnation will advance the goal of better seaports and airports expressed in a recent constitutional amendment. However, not all actions purporting to be taken under N.C. Const. art. V, § 13(1)(a) would necessarily be for a public purpose or public use.

**4. Constitutional Law— Commerce Clause—not a defense to condemnation**

The Commerce Clause is not a sustainable defense to the condemnation of real property.

On discretionary review pursuant to N.C.G.S. § 7A-31, prior to a determination by the Court of Appeals, of an order entered on 20 April 2000 by DeRamus, J., in Superior Court, Guilford County. Heard in the Supreme Court 14 March 2001.

*Smith Helms Mulliss & Moore, L.L.P., by James G. Exum, Jr., Bruce P. Ashley, and Michael C. Mascia; and Cooke & Cooke, L.L.P., by William O. Cooke, Jr., for plaintiff-appellee.*

*Law Offices of William F. Maready, by William F. Maready and Celie B. Richardson, for defendant-appellant Kent Urbine.*

*Office of the City Attorney, Rebecca K. Cheney, Assistant City Attorney, on behalf of City of Charlotte; and Moore & Van Allen, PLLC, by James M. Tatum and James W. Dymond, on behalf of Raleigh-Durham Airport Authority, amici curiae.*

BUTTERFIELD, Justice.

The Piedmont Triad Airport Authority (PTAA), located in Guilford County, instituted a condemnation action on 14 December 1998 to acquire 2.326 acres of land owned in fee simple by Kent W. Urbine, subject to liens held by the other named defendants. In his answer to PTAA's complaint, defendant challenged PTAA's assertion that the condemnation is for a public purpose. On appeal, defendant specifically alleges that his property is being condemned for the exclusive use of Federal Express Corporation (Federal Express), a current tenant of PTAA.

Pursuant to N.C.G.S. § 40A-47, a hearing was held at the 20 March 2000 Civil Session of Superior Court, Guilford County, to determine issues other than compensation. On 20 April 2000, the trial court entered an order in which it ruled that plaintiff had the authority to condemn the property, ruled that the taking was for a public purpose and use, determined all issues other than that of just compensation in favor of plaintiff, vested plaintiff with fee simple title to the property, granted plaintiff the right to immediate possession of the property, and dismissed defendant Urbine's counterclaim with prejudice. On 20 December 2000, this Court granted defendant-appellant Kent Urbine's petition for discretionary review prior to a determination by the Court of Appeals.

Defendant presents three questions for this Court's consideration: first, whether the trial court committed reversible error in ruling that the condemnation of defendant's property was for a public

**PIEDMONT TRIAD AIRPORT AUTH. v. URBINE**

[354 N.C. 336 (2001)]

purpose and, thus, not violative of Article V, Section 2(1) of the Constitution of North Carolina; second, whether the trial court committed reversible error in ruling that the economic incentives proposed to Federal Express were immaterial to this action and provided no defense to the condemnation; and third, whether the trial court committed reversible error in ruling that the condemnation was authorized by PTAA's charter.

Defendant focuses his first arguments upon the public purpose clause of Article V, Section 2(1) of the Constitution of North Carolina, which provides that "[t]he power of taxation shall be exercised in a just and equitable manner, for public purposes only, and shall never be surrendered, suspended, or contracted away." N.C. Const. art. V, § 2(1). Defendant argues that PTAA's exercise of eminent domain here is not for a public purpose and is, therefore, unconstitutional.

**[1]** In the recent condemnation case of *Piedmont Triad Reg'l Water Auth. v. Sumner Hills Inc.*, 353 N.C. 343, 543 S.E.2d 844 (2001), we established that *de novo* review is the appropriate standard of review for a hearing pursuant to N.C.G.S. § 40A-7(a). In that case, we stated the following:

> It is well settled that de novo review is ordinarily appropriate in cases where constitutional rights are implicated. *See, e.g., State v. Rogers*, 352 N.C. 119, 124, 529 S.E.2d 671, 674-75 (2000) (whether to grant a motion to continue is in the trial court's discretion; however, when a constitutional question is implicated, de novo review is appropriate); *see also Ornelas v. United States*, 517 U.S. 690, 696-97, 134 L. Ed. 2d 911, 918-19 (1996) (in reviewing constitutional standards that are not "finely-tuned," de novo review is necessary for appellate courts to maintain control of and clarify the legal principles, to "unify precedent," and to provide a defined set of rules).

*Piedmont Triad Reg'l Water Auth.*, 353 N.C. at 348, 543 S.E.2d at 848. In *Piedmont Triad Reg'l Water Auth.*, this Court examined a taking under N.C.G.S. § 40A-7(a) where the condemnor sought to condemn an entire tract of land that included a 97-acre portion acquired in excess of the public use. In the instant case, we are examining similar constitutional questions and pertinent statutes that call upon us to be "mindful of our duty to construe the statute[s], if possible, in a constitutional fashion." *Id.* Therefore, we hold that *de novo* review is the appropriate standard of review applicable to the case *sub judice*.

**[2]** We must clarify two terms that have recently been treated almost synonymously. There remains a distinction between the terms "public purpose" and "public use." Although the analysis in determining both is often similar, the term "public purpose" pertains to governmental expenditures of tax monies, while the term "public use" pertains to the exercise of eminent domain. This Court noted the distinction in *City of Charlotte v. Heath*, 226 N.C. 750, 40 S.E.2d 600 (1946), by stating, "[I]n any proceeding for condemnation under the power of eminent domain, what is a public purpose, or, more properly speaking, a public use, is one for the Court." *Id.* at 754, 40 S.E.2d at 604. Here, we will apply the term "public use" in its relation to the exercise of eminent domain. However, we cannot escape some mentioning of the related term "public purpose" as we refer to prior holdings. These holdings remain pertinent in the application of the public purpose clause of Article V, Section 2(1).

**[3]** Defendant correctly notes that the power of eminent domain can be used to condemn private property only if it is for a public use. *Piedmont Triad Reg'l Water Auth.*, 353 N.C. at 346, 543 S.E.2d at 847. As we stated in *Maready v. City of Winston-Salem*, 342 N.C. 708, 720, 467 S.E.2d 615, 623 (1996), "[t]his Court is no stranger to the question of what activities are and are not a public purpose." Nonetheless, as Justice (later Chief Justice) Sharpe wrote in *Mitchell v. N.C. Indus. Dev. Fin. Auth.*, 273 N.C. 137, 144, 159 S.E.2d 745, 750 (1968), "[a] slide-rule definition to determine public purpose for all time cannot be formulated." Our recent holdings in *Madison Cablevision, Inc. v. City of Morganton*, 325 N.C. 634, 386 S.E.2d 200 (1989), and *Maready* have employed a two-prong analysis to aid the determination of public purpose in each case before us. Relying on *Madison Cablevision*, this Court in *Maready* stated, " '[t]wo guiding principles have been established for determining that a particular undertaking by a municipality is for a public purpose: (1) it involves a reasonable connection with the convenience and necessity of the particular municipality; and (2) the activity benefits the public generally, as opposed to special interests or persons.' " *Maready*, 342 N.C. at 722, 467 S.E.2d at 624 (quoting *Madison Cablevision*, 325 N.C. at 646, 386 S.E.2d at 207 (citations omitted)). This analysis is equally applicable in determining what is and what is not a public use. We will apply the same two-prong analysis to the instant case.

Under the first prong of the analysis, the taking must have " 'a reasonable connection with the convenience and necessity of the particular municipality' "—here, an airport authority. *Id.* (quoting

PIEDMONT TRIAD AIRPORT AUTH. v. URBINE

[354 N.C. 336 (2001)]

*Madison Cablevision,* 325 N.C. at 646, 386 S.E.2d at 207). PTAA's master plan has called for the acquisition of defendant's property from as early as 1990. A revised master plan in 1994 also called for the property's acquisition. The purpose, under the 1994 master plan, of acquiring defendant's property was the future expansion and development of cargo facilities. The convenience and necessity of having an air-cargo facility adjacent to existing airport runways and facilities is undisputed. The obvious nature of PTAA's designs for expansion and improvement of the airport satisfies the first prong of our analysis.

The second prong of our analysis requires us to determine whether " 'the activity benefits the public generally, as opposed to special interests or persons.' " *Id.* (quoting *Madison Cablevision,* 325 N.C. at 646, 386 S.E.2d at 207). PTAA was created under N.C.G.S. § 63-4, which allows municipalities to join together in establishing airports. N.C.G.S. § 63-4 (1999) (this statute was enacted in 1929 and has not been amended since its enactment). PTAA's supplementary enabling legislation, or charter, provides that "[a]ny lands acquired, owned, controlled or occupied by the said Airport Authority shall, and are hereby declared to be acquired, owned, controlled and occupied for a public purpose" and expressly authorizes the use of eminent domain. Act of June 6, 1980, ch. 1078, sec. 3(g)-(h), 1979 N.C. Sess. Laws (2d Sess. 1980) 1, 4. In a case dealing with the same airport authority at issue here, although then named differently, we stated the following:

> The public statute, G.S.[] 63-4, permitting the three municipalities concerned to act jointly is not repealed or modified, or its authority in any way affected by the supplementary acts under which the purpose and policy of the public statute are carried out in the creation of a single Airport Authority to serve all three municipalities—obviously the only way in which it could be done.

*Greensboro-High Point Airport Auth. v. Johnson,* 226 N.C. 1, 10, 36 S.E.2d 803, 810 (1946). The *Greensboro-High Point* holding that N.C.G.S. § 63-4 and the airport authority's charter operate in tandem is significant for the purposes of N.C.G.S. § 63-5, which provides as follows:

> Any lands acquired, owned, controlled, or occupied by such cities, towns, and/or counties, for the purposes enumerated in G.S. 63-2, 63-3 and 63-4 [permitting municipalities to join together in establishing airports], shall and are hereby declared to be

acquired, owned, controlled and occupied for a public purpose, and such cities, towns and/or counties shall have the right to acquire property for such purpose or purposes under the power of eminent domain as and for a public purpose.

N.C.G.S. § 63-5 (1999).

Any determination of what is a public use must rest upon the notions of the types of activities in which governmental bodies are to be engaged. Significantly, we must take notice of declarations expressed by the people of this state when they amend their constitution. We note that a recent amendment bears directly on the issues raised in the present action. The ratified amendment to Article V of the Constitution of North Carolina reads, in pertinent part:

### Sec. 13. Seaport and airport facilities.

(1) Notwithstanding any other provision of this Constitution, the General Assembly may enact general laws to grant to the State, counties, municipalities, and other State and local governmental entities all powers useful in connection with the development of new and existing seaports and airports, and to authorize such public bodies:

> (a) to acquire, construct, own, own jointly with public and private parties, lease as lessee, mortgage, sell, lease as lessor, or otherwise dispose of lands and facilities and improvements, including undivided interest therein[.]

N.C. Const. art. V, § 13(1)(a). This provision of the Constitution of North Carolina expresses the clear public sentiment that the governmental entities named within Article V, Section 13(1) should be engaged in developing and improving airports. However, we believe that not all actions purporting to be taken under the provision would necessarily be for a public purpose or for a public use.

Article V, Section 13(1) starts by stating, "Notwithstanding any other provision of this Constitution." *Id.* We read this language to supersede any other provision of the Constitution that may be in conflict with the provisions of Article V, Section 13(1)(a). We must, therefore, determine whether Article V, Section 2(1) is in conflict with Article V, Section 13(1)(a). We do not believe that it is.

Article V, Section 2(1) does not conflict with Article V, Section 13(1)(a) in such a manner that the airport and seaport facilities pro-

vision cannot be implemented as envisioned by the people of this state. In *Lacy v. Fidelity Bank of Durham*, 183 N.C. 373, 111 S.E. 612 (1922), this Court stated that "a constitution shall be construed on broad and liberal lines[] and so as to give effect to the intention of the people who have adopted it" and that a constitution "should be considered as a whole and construed to allow significance to each and every part of it, if this can be done by any fair and reasonable intendment." *Id.* at 380, 111 S.E. 615. The public purpose clause of Article V, Section 2(1) acts in concert with Article V, Section 13(1)(a). All endeavors pursuant to Article V, Section 13(1)(a) can be fully realized insofar as they are for a public purpose or a public use. Article V, Section 2(1) does not act as a prohibition against developing and improving airports and seaports under Article V, Section 13(1)(a). Rather, Article V, Section 2(1) acts as a qualifier upon such undertakings.

Reading the Constitution of North Carolina as a whole and giving significance to each part, we believe that the people did not intend to abrogate the public purpose doctrine upon the adoption of Article V, Section 13. Article V, Section 2(1) and Article V, Section 13 operate concurrently. To hold otherwise would create a *per se* presumption of public purpose and public use under Article V, Section 13 for any and all undertakings. This would be inconsistent with this Court's holdings that public purpose and public use cases are to be decided on a case-by-case basis. *See, e.g., Maready*, 342 N.C. at 716, 467 S.E.2d at 620.

The significance of Article V, Section 13 under the second prong of our analysis is the clear desire of the people for governmental involvement in the development and improvement of airports and seaports. While the legislative declarations of public purpose and the people's desire under Article V, Section 13 influence our determination, we must still examine the particular use for defendant's property.

We are aware that the timing of the events surrounding this condemnation proceeding point to an inference that the property is being acquired to prepare for the accommodation of an expanded Federal Express facility. Our review of the facts leads us to the conclusion, consistent with that of the trial court, that the condemnation proceeding arises from PTAA's long-range plan to develop air-cargo facilities as called for in the master plan. While the overtures from Federal Express may have hastened the timing of this development, they are not the genesis of PTAA's actions.

Defendant contends that the property subject to the taking will be for the exclusive use and benefit of Federal Express, thereby making PTAA's actions a condemnation for a private rather than public use. The record reveals that Federal Express, which currently rents space at the airport, will pay for the cost of the facility's construction and will then pay rent to PTAA while a tenant. This is not an uncommon arrangement for PTAA and its tenants. Federal Express will not become the owner of defendant's property. If the facility is built, Federal Express will continue to be a tenant of PTAA, except that Federal Express will be in a larger facility that it will help construct. We believe that the concepts of improvement and development envision the physical expansion of such facilities. This is consistent with the public desire under Article V, Section 13, to improve existing airports. The arrangement advances the primary goal of giving effect to the people's general desire for better seaports and airports. As such, the greater benefits flow to the people, as they have constitutionally directed, with their understanding that there will be incidental benefits to private companies involved. Under these facts, the legislative declarations of public purpose, and the constitutional directives of the people, we are persuaded that both prongs of our analysis are satisfied.

Defendant also alleges that the taking violates the Fifth Amendment to the United States Constitution but makes no argument further on this point. Therefore, we deem this contention to be abandoned. N.C. R. App. P. 28(b)(5).

For the reasons above, we believe that PTAA's condemnation of defendant's property pursuant to PTAA's master plan is for a public use and does not violate Article V, Section 2(1) of the Constitution of North Carolina. Therefore, we hold that the trial court did not err in its ruling that the taking was for a public use and was not violative of Article V, Section 2(1), and we overrule this assignment of error.

[4] Defendant next challenges this condemnation proceeding by alleging that PTAA offered Federal Express numerous unconstitutional incentives to build its air cargo hub at the airport. Defendant classifies the condemnation as one of the incentives. Specifically, defendant contends that the proposed incentives violate Article I, Section 8, Clause 3[1] (the Commerce Clause) of the United States

---

1. In his brief, defendant referred to Article I, Section 8, Clause 2 but quoted the language of Clause 3. It is clear from the context, however, that defendant meant to refer to Clause 3.

Constitution; the Fourteenth Amendment to the United States Constitution; and Article V, Section 2(1) of the Constitution of North Carolina. Defendant cites no authority in support of his Article V, Section 2(1) or Fourteenth Amendment arguments. Therefore, we deem them to be abandoned. N.C. R. App. P. 28(b)(5).

The only portion of this issue properly before this Court is the condemnation of defendant's property. Defendant's challenge to the "package" of economic incentives, apart from the use of eminent domain, pertains to offers by entities not parties to this action and is outside the scope of our review. Thus, the only remaining question presented in this issue is whether the Commerce Clause is a sustainable defense to the condemnation proceeding. The dormant, or negative, Commerce Clause is awakened only when Congress has not acted "to regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. We find no case law that supports the proposition that the Commerce Clause is a sustainable defense to the condemnation of real property. This assignment of error is overruled.

Lastly, defendant maintains that PTAA's charter does not authorize PTAA's condemnation of defendant's property and subsequent development and leasing of the property. For the reasons previously stated elsewhere in this opinion, we find this assignment of error without merit.

Accordingly, we affirm the order of the trial court.

AFFIRMED.